<div align="center">

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

</div>

| | |
|---|---|
| **GEORGE YASSA**<br>349 Portico Aisle<br>Irvine, California 92606<br>*Resident of Orange County*<br><br>and<br><br>**ERIC ARNICAR**<br>33 High Street<br>Stuartstown, Pennsylvania 17363<br>*Resident of York County*<br><br>and<br><br>**DAVID BATES**<br>12610 Jupiter Road, Apartment 327<br>Dallas, Texas 75238<br>*Resident of Dallas County*<br><br>and<br><br>**MARC BLAZEJAK**<br>1918 Crafton Avenue<br>Baltimore, Maryland 21222<br>*Resident of Baltimore County*<br><br>and<br><br>**DANIEL DAUSCH**<br>1203 Carsinwood Court<br>Aberdeen, Maryland 21001<br>*Resident of Harford County*<br><br>and<br><br>**STEVEN WEBSTER, JR.**<br>2516 Wycliffe Road<br>Parkville, Maryland 21234<br>*Resident of Baltimore County*<br><br><div align="center">Plaintiffs,</div> | <u>Jury Trial Requested</u><br><br><br><br><br><br><br><br><br><br><br><br>Collective/Class Action Claim<br><br><br><br><br><br><br><br><br><br><br>Civil Action No.: |

*Individually and on Behalf of All*
*Similarly Situated Employees*

v.

**EM CONSULTING GROUP, INC. T/A**
**HELIONAUTOMOTIVE**
**TECHNOLOGIES**
1429 Ivy Hill Road
Cockeysville, Maryland 21030

Serve:  David J. Polashuk, R.A.
   36 S. Charles Street, Suite 1504
   Baltimore, Maryland 21201

     Defendant.

## COLLECTIVE AND CLASS COMPLAINT FOR WAGES OWED

GEORGE YASSA, ERIC ARNICAR, DAVID BATES, MARC BLAZEJAK, DANIEL DAUSCH, and STEVEN WEBSTER, Plaintiffs, by and through their undersigned counsel and The Law Offices of Peter T. Nicholl, on behalf of themselves and all others similarly situated, hereby submit their Complaint against EM CONSULTING GROUP, INC. T/A HELION AUTOMOTIVE TECHNOLOGIES, Defendant, to recover unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Section 16(b) of the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.* (hereinafter, "FLSA"); unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.* (hereinafter, "MWHL"); and unpaid wages, treble damages, interest, reasonable attorneys' fees and costs under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501, *et seq.* (hereinafter, "MWPCL"), and in support thereof, state as follows:

## INTRODUCTION AND BACKGROUND

Defendant EM Consulting Group, Inc. (hereinafter, "EM") is a Maryland-based Information Technology (hereinafter, "IT") company that specializes in servicing auto dealerships. EM trades under the name of Helion Automotive Technologies (hereinafter, "Helion"). Helion serves auto dealerships across the state of Maryland and several other states. Among the services provided by Helion are general network and computer installation, maintenance, and support. Helion employs a large number of technicians and/or engineers, project leads, lead technicians, and project managers. These positions do not require any advanced academic training. All that is needed is the training that Defendant provides.

Plaintiffs and other similarly situated employees, throughout their employment with Defendant, held several different positions with Helion. These positions include those listed above; notably Desktop Support Engineers/Technicians, Systems and Project Engineers/Technicians, Lead Engineers/Technicians, Proactive Administrators, and Network Specialists (hereinafter collectively, "Technicians"). From approximately March of 2007 until September 2016, Plaintiff George Yassa (hereinafter, "Yassa"), was employed with Defendant. During his tenure Yassa held several titles, including Project Lead Technician and Project Department Manager. From approximately August 2011 to June 2016, Plaintiff Eric Arnicar (hereinafter, "Arnicar") was employed with Defendant. For the entirety of his employment with Defendant, Arnicar held the title of Systems Engineer/Technician. From approximately January 2013 to August 23, 2016 Plaintiff David Bates (hereinafter, "Bates") was employed with Defendant. During his tenure Bates held three (3) titles with Defendant, including Desktop Support Engineer/Technician, Proactive Administrator, and Network Specialist. From approximately August 2013 to July 22, 2016 Plaintiff Marc Blazejak (hereinafter, "Blazejak") was

employed with Defendant. Blazejak also held several different titles during his tenure, including Desktop Support Technician/Engineer I and II as well as Proactive Administrator. From approximately January 2011 to December 2014, Plaintiff Daniel Dausch (hereinafter, "Dausch") was employed with Defendant as a Proactive Administrator. From approximately March 2010 to August 2015, Plaintiff Steven Webster Jr. (hereinafter, "Webster") was employed with Defendant. During his tenure, Webster held four (4) titles with Defendant: Desktop Support Engineer/Technician I, Desktop Support Engineer/Technician II, Proactive Administrator, and Network Engineer/Technician. Throughout their employment, Plaintiffs were paid on a salary basis and received the same weekly compensation regardless of the number of hours they worked each week. It is this fact that gives rise to the instant Complaint.

When Plaintiffs were hired by Defendant, they were told that their schedules would consist of forty (40) hours per week. Plaintiffs were told they would be working from 8:00 a.m. to 5:00 p.m. Monday through Friday, with a one-hour (1) lunch break. For most of Plaintiffs' tenures with Defendant, they worked far in excess of (40) hours per week. It was routine for Plaintiffs to be required to skip lunch or eat at their desks while working. They were often required to attend meetings or continue work-related assignments during their scheduled lunch breaks. Plaintiffs were also placed on an on-call rotation that often required them to be on call both before and after working hours and on weekends. Plaintiffs would also regularly stay well after their scheduled shift had ended and would continue to respond to emails and/or telephone calls after hours.

Understaffing was an issue that consistently contributed to the excessive hours noted above. Defendant routinely and intentionally kept its office understaffed. Defendant was able to keep costs low by paying its employees under the guise of a salary. This enabled Defendant to avoid the overtime payments that would have resulted from the schedules Plaintiffs and other

similarly situated employees worked. Defendant made clear that Plaintiffs and other similarly situated employees had to work the schedules imposed on them. Failure to do so would result in termination. Defendant had a common practice of "making examples" out of employees through termination, engendering a culture of fear and uncertainty among its employees. This resulted in a high turnover rate, which in turn forced Plaintiffs and other similarly situated employees to "pick up the slack." Plaintiffs and other similarly situated employees were required to work extended hours to ensure all of their assignments were completed.

Plaintiffs and other Technicians were also often required to assist Helion's customers with their IT needs on-site. This required Plaintiffs and other Technicians to perform their duties at Helion's customers' locations and to spend time traveling to and from those locations. This further contributed to the overtime hours worked. As a result of these circumstances, Plaintiffs and other technicians routinely worked far in excess of forty (40) hours per week. Working as many as seventy (70) or eighty (80) hours per week was not uncommon.

Plaintiffs and other Technicians were never properly compensated for working over forty (40) hours each week. Defendant avoided these overtime payments by paying Plaintiffs and other Technicians under the guise of a salary. Plaintiffs and other Technicians never received any additional payments outside of their salary.[1] Defendant intentionally misclassified Plaintiffs and other technicians, treating them as exempt employees. However, Plaintiffs and other technicians did not perform any duties that would exempt them from the overtime requirements of the FLSA or MWHL.

---

[1] In September of 2015 Defendant reclassified some of its Technicians as hourly employees. For those employees, the period relevant to this Complaint ends when they began to be paid hourly and received proper overtime pay.

Despite numerous complaints by Plaintiffs and other Technicians, Defendant refused to change its pay practices. Defendant refused to pay Plaintiffs and other Technicians for the excessive overtime hours they worked. Defendant also failed to pay all compensation due to Plaintiffs and other Technicians when their employment ended, in direct violation of the MWPCL. Under the MWPCL, Defendant should have paid Plaintiffs and other Technicians all wages owed to them, including overtime wages, at the end of their employment. To date, Defendant has not done so.

Through these unlawful practices, Defendant evaded the payment of all wages owed to Plaintiffs and others similarly situated. This violates the standards set forth by the FLSA, MWHL and the MWPCL. To date, Defendant continues to engage in this unlawful activity. This activity mandated the filing of this Complaint.

## THE PARTIES

1.      Plaintiff Yassa is an adult resident of Orange County, California.

2.      Plaintiff Arnicar is an adult resident of York County, Pennsylvania

3.      Plaintiff Bates is an adult resident of Dallas County, Texas.

4.      Plaintiff Blazejak is an adult resident of Baltimore County, Maryland.

5.      Plaintiff Dausch is an adult resident of Harford County, Maryland.

6.      Plaintiff Webster is an adult resident of Baltimore County, Maryland.

7.      Defendant EM Consulting Group, Inc. t/a Helion Automotive Technologies (hereinafter, "Defendant," "EM," and/or "Helion")[2] is an information technology company.

---

[2] Hereinafter, any reference to Defendant shall include its corporate officers and all those empowered to act as agents of the corporation, either explicitly or implicitly, or who are designated as agents under the doctrine of apparent agency. To the extent individual agents are responsible for any actions alleged in this Complaint, they are hereby incorporated by reference within the term "Defendant."

Defendant provides network and computer installation and support services to automobile dealers across the state of Maryland and throughout the United States.

8.      EM registered the trade name "Helion Automotive Technologies" in 2005 and currently trades under that name.[3]

9.      The Helion Automotive Technologies trade name is entirely and solely owned by EM.

10.     Defendant's principle office is located at 1429 Ivy Hill Road, Cockeysville, Maryland 21030.

11.     Defendant also has an office located at 1965 Greenspring Drive, Timonium, Maryland 21093, out of which Helion Automotive Technologies operates.

12.     Defendant operates by employing a wide array of computer, and other, technicians. These technicians are split into two (2) departments: Defendant's Project Department and Defendant's Support Department. These departments interact on a daily basis, and routinely perform concurrent duties. They are separated based solely on their primary duties.

13.     The technicians primarily assigned to Defendant's Project Department assist Defendant's clients with installing and upgrading their systems and/or networks. These technicians also accept and process remote service calls in Defendant's offices and will sometimes travel to Defendant's clients' locations, when necessary, to complete their work. These employees include Systems Engineers/Technicians, Project Engineers/Technicians, and Technical Project Leads (hereinafter collectively referred to as, "Project Technicians"). Defendant also employs Project Department Managers.

---

[3] EM Consulting Group, Inc. and Helion Automotive Technologies are one entity. As such, any reference to "Defendant," "Helion," "EM Consulting," or any abbreviation thereof, shall refer to Defendant EM Consulting Group, Inc.

14.     The technicians primarily assigned to Defendant's Support Department assist Defendant's clients with routine IT issues.  These technicians also backup Defendant's clients' systems and files, as well as tending to Defendant's clients' network security.  These employees include Desktop Support Engineers/Technicians, Proactive Administrators, and Network Specialists (hereinafter collectively referred to as, "Support Technicians").

15.     Due to the nature of its business, Defendant is subject to the FLSA, MWHL and the MWPCL.  Defendant's business meets the definition of a retail or service establishment.

16.     Defendant is also subject to the FLSA, MWHL and the MWPCL as Defendant's annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

17.     At all times relevant to this Complaint, Plaintiffs engaged in interstate commerce based on the nature of the duties performed by Plaintiffs as part of their employment with Defendant.

18.     Plaintiffs worked for Defendant who, at all times throughout Plaintiffs' employment, fell within the definition of the term "employer" under the FLSA [29 U.S.C. § 203(d)], MWHL [Md. Code Ann., Lab. & Empl. § 3-401(b)] and the MWPCL [Md. Code Ann., Lab. & Empl. § 3-501(b)].

19.     At all times relevant to this matter, Plaintiffs and other similarly situated employees worked as non-exempt employees for Defendant and should have been classified as such.

20.     The duties assigned to Plaintiffs and all others similarly situated, do not satisfy the duties tests contained within any of the exemptions specified in the FLSA, MWHL, or the MWPCL.

21.     From approximately March 2007 to September 2016 Yassa was employed with Defendant and held various positions providing technical support to Defendant's clients.

22.     From approximately August 2011 to June 2016 Arnicar was employed with Defendant and held the position of Systems Engineer/Technician.

23.     From approximately January 2012 to August 23, 2016 Bates was employed with Defendant and held various positions providing technical support to Defendant's clients.

24.     From approximately August 2013 to July 22, 2016 Blazejak was employed with Defendant and held various positions providing technical support to Defendant's clients.

25.     From approximately January 2011 to December 2014 Dausch was employed with Defendant and held the title of Proactive Administrator.

26.     From approximately March 2010 to August 2015 Webster was employed with Defendant and held various positions providing technical support to Defendant's clients.

27.     Throughout their employment, Plaintiffs worked out of Defendant's Timonium, Maryland, location.

28.     At all times relevant to this Complaint, Defendant controlled the administration of its business and set employee schedules, including those of Plaintiffs and others similarly situated.

29.     Defendant's agents were, individually and together, actively engaged in the management and direction of Plaintiffs and other similarly situated employees.

30.     Defendant possessed and exercised authority to determine the hours worked by Plaintiffs and others similarly situated.

31.     Defendant had the authority to control Plaintiffs' tasks and the tasks of others similarly situated.

32.     Defendant had and exercised the power and authority to change the course of the duties of Plaintiffs and other similarly situated employees.

33.     Defendant made all decisions relating to Plaintiffs' and other similarly situated employees' rates and methods of pay.

34.     Plaintiffs and members of the putative classes recognized Defendant's authority and obeyed Defendant's instructions.

## JURISDICTION AND VENUE

35.     Original jurisdiction in this Honorable Court is expressly provided by FLSA, 29 U.S.C. § 207, *et seq*.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

36.     Discretionary supplemental jurisdiction of Plaintiffs' Maryland state law claims is provided by 28 U.S.C. § 1367(a); the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts, on which Plaintiffs' federal claims are based.

37.     Furthermore, no reasons exist that would force this Honorable Court to decline jurisdiction; the state law claims (i) do not raise novel or complex issues of state law, (ii) do not substantially predominate the claims over which this Honorable Court has original jurisdiction and (iii) no exceptional circumstances exist that would constitute a compelling reason for declining jurisdiction, thereby satisfying 28 U.S.C. 1367(c).

38.     Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred primarily within the State of Maryland.

39.     This Honorable Court has personal jurisdiction over Defendant as Defendant is a corporation incorporated under the laws of Maryland and Defendant conducts sufficient business within the forum state so as to constitute a submission to its laws.

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

### *Employment*

40.     Defendant is an IT company that caters to automotive dealers throughout the state of Maryland and across the country.  Defendant provides network and computer installation, as well as maintenance and IT support services.

41.     To service its clients, Defendant employs Technicians to work in its Project Department and its Support Department (hereinafter collectively referred to as, "Technicians"), both remotely and on-site.  Technicians are charged with installing, maintaining, and supporting Defendant's clients' software and/or hardware.

42.     Defendant typically splits its Technicians into small groups, each with a more experienced Engineer/Technician "leading" the group.  The titles of these leaders vary per department, and include Project Technical Leads and Desktop Support Engineers/Technicians III (hereinafter, "Lead").  The Leads' duties do not differ from those of the other Technicians in that same department, nor do the Leads have any authority over the terms and conditions of the other Technicians' employment.  The designation of a Technician as a Lead was primarily a result of the Technician's experience, which was typically greater than that of the other Technicians.[4]

43.     Yassa held various titles during the course of his employment with Defendant: beginning with Systems Engineer/Technician and ending with Project Department Manager. Yassa was hired on March 20, 2007, as a Systems Engineer/Technician and held that title until October 2013.    In approximately November 2013 Yassa was promoted to Project Engineer/Technician, a position he held until approximately August 2015.   From approximately

---

[4] Certain Technicians were designated as Leads for simply having seniority in the company, regardless of their overall experience level.

September 2015 to April 2016, Yassa was employed with Defendant as a Technical Project Lead. In approximately April 2016 Yassa was promoted to Project Department Manager. Yassa held this position until his termination on September 15, 2016.

44. Arnicar held the title of Systems Engineer/Technician for the duration of his employment with Defendant. Arnicar was hired in August 2011 as a Systems Engineer/Technician and held that position until he quit in June 2016.

45. Bates held different titles during the course of his employment: beginning with Desktop Support Engineer/Technician and ending with Network Specialist. Bates was hired in approximately January of 2012 as a Desktop Support Engineer/Technician I, and held that position until August of 2012 when Bates was promoted to Proactive Administrator. Bates held the position of Proactive Administrator until he was promoted, in April of 2014, to Network Specialist. Bates held the title of Network Specialist until he quit on August 23, 2016.

46. Blazejak held different titles during the course of his employment: beginning with Desktop Support Engineer/Technician and ending with Proactive Administrator. Blazejak was hired in approximately August of 2013 as a Desktop Support Engineer/Technician I, and held that position until July of 2014 when Blazejak was promoted to Desktop Support Engineer/Technician II. Blazejak held that position until he was promoted in March of 2015 to Proactive Administrator. Blazejak held that position until he quit on July 22, 2016.

47. Dausch held the same title during the entire course of his employment: that of Proactive Administrator. Dausch was hired on approximately January 4, 2011 as a Proactive Administrator. Dausch held that position until he was let go in December of 2014.

48. Webster held different titles during the course of his employment, ranging from Desktop Support Engineer/Technician I to Network Specialist. Webster was hired in

approximately March 2010 as a Desktop Support Technician I.  Webster quit, in August of 2015, as a Network Specialist, a position he held for approximately six (6) to eight (8) months.  Webster held the positions of Desktop Support Engineer/Technician II and Proactive Administrator at various times throughout his employment.

49.     Until sometime between September 2015 and February 2016, all of Defendant's Technicians tracked their time via time keeping software but were paid on a salary basis.   In approximately September of 2015, Defendant re-classified many of its low-salaried Technicians to hourly employees.  Those Technicians continued to clock in/out using Defendant's software.  The Technicians who were not re-classified ceased tracking their time and continued to be paid on a salary basis.

50.     Whether a Technician was reclassified at this time depended solely on their salary level.  If a Technician had an annual salary of fifty thousand dollars ($50,000.00) or less, that Technician was re-classified to an hourly employee.  If a Technician had an annual salary of more than fifty thousand dollars ($50,000.00) that Technician continued be treated as an exempt employee and was paid a salary.

51.     The duties of the Technicians did not change, regardless of whether or not they were re-classified.

### *Duties*

52.     *Desktop Support Engineer/Technician I and II.*  Plaintiffs Bates', Blazejak's, and Webster's duties as Desktop Support Engineers/Technicians mirrored those of all Systems Engineers/Technicians, regardless of their respective level (I, II, or III).

53.     As Desktop Support Engineer/Technician Is and/or IIs (hereinafter collectively, "Desktop Support Engineers/Technicians"), Bates', Blazejak's, and Webster's duties centered

around resolving Defendant's clients' technical issues. Specifically, Bates, Blazejak, Webster, and other Desktop Support Engineers/Technicians were Defendant's first line of defense when it came to handling IT issues for its clients. All of Defendant's clients' IT issues came through Bates, Blazejak, Webster, and other similarly situated Desktop Support Engineers/Technicians.

54.     Once a call came in, a digital "ticket" would be generated. The ticket was then assigned by Defendant to a particular Desktop Support Engineer/Technician's queue.

55.     Bates, Blazejak, Webster, and other Desktop Support Engineers/Technicians were required to respond to a service call by the business day following its receipt. Failure to at least contact the client by that time resulted in disciplinary actions. This meant that Bates, Blazejak, Webster, and other Desktop Support Engineers/Technicians were often required to remain after hours to ensure that all tickets were completed in a timely manner.

56.     Almost all tickets could be dealt with remotely, either at Defendant's Greenspring location or another internet-accessible location. For those that could not be dealt with remotely, Bates, Blazejak, Webster, and other Desktop Support Engineers/Technicians were required to travel to Defendant's clients' locations. At times Bates, Blazejak, Webster, and other Desktop Support Engineers/Technicians would accompany Systems Engineers/Technicians, and other individuals assigned to a project, as they sought to assist Defendant's clients that were involved in an initial onboarding or upgrade project.

57.     There was no actual difference between a Desktop Support Engineer/Technician I and a Desktop Support Engineer/Technician II. The duties assigned to and performed by both Is and IIs were identical. The only difference was the individual's seniority and/or experience.

58.     Being promoted to Desktop Support Engineer/Technician II meant that Desktop Support Engineer/Technician Is could come to that individual with technical questions.

59.     This promotion did not grant the Desktop Support Engineer II any authority over the terms and/or conditions of employment of Desktop Support Engineers/Technician Is.

60.     In the event that Bates, Blazejak, Webster, and other Desktop Support Engineers/Technicians were unable to complete a ticket, for whatever reason, they would escalate the ticket to Defendant's Systems Engineers/Technicians.

61.     *Systems Engineer/Technician.*  Yassa's and Arnicar's duties as Systems Engineers/Technicians mirrored those of all Systems Engineers/Technicians.

62.     As a Systems Engineer/Technician, Yassa's and Arnicar's duties centered around resolving Defendant's clients' technical issues.  Specifically, Yassa, Arnicar, and other Systems Engineers/Technicians would handle support calls that were escalated by a Desktop Support Engineer/Technician.

63.     These calls typically involved an issue relating to IT issues affecting multiple users, including internet outages, email server problems, internet speed issues, and server malfunctions.

64.     Yassa, Arnicar, and other Systems Engineers/Technicians would resolve these technical issues remotely if possible.

65.     Yassa, Arnicar, and other Systems Engineers/Technicians would also assist Project Engineers/Technicians with their projects, and this required that Yassa, Arnicar, and other Systems Engineers/Technicians travel to Defendant's clients' locations to assist with the project.[5]

66.     *Proactive Administrator.*  Bates', Blazejak's, Dausch's, and Webster's duties as Proactive Administrators mirrored those of all Proactive Administrators.

67.     As Proactive Administrators, Bates, Blazejak, Dausch, Webster, and other Proactive Administrators' duties centered on providing back-up support for Defendant's clients in

---

[5] *See infra* ¶¶ 74-81.

the event data was lost and/or corrupted. Specifically, Bates, Blazejak, Dausch, Webster, and other Proactive Administrators would back-up Defendant's clients' information on a regular basis.

68. Additionally, for any data that was lost or corrupted, Bates, Blazejak, Dausch, Webster, and other Proactive Administrators would recover the data.

69. Bates, Blazejak, Dausch, Webster, and other Proactive Administrators would also regularly update and maintain Defendant's clients' anti-virus software.

70. Bates, Blazejak, Dausch, Webster, and other Proactive Administrators focused on preventative maintenance. Once assigned to a particular client of Defendant, Bates, Blazejak, Dausch, Webster, and other Proactive Administrators would be required to keep Defendant's clients' anti-virus software up to date, regularly back-up the files, and respond to any requests for the recovery of any backed-up files and/or documents.

71. *Network Specialist.* Bates' and Webster's duties as Network Specialists mirrored those of all Network Specialists.

72. As a Network Specialist, Bates' and Webster's duties centered around servicing Defendants' clients' networks. Specifically, Bates, Webster, and other Network Specialists would set up and maintain the networks that connected Defendant's clients' various devices such as desktop computers, printers, phones, internet, and other hardware and network components.

73. Bates, Webster, and other Network Specialists were also called upon when there was a network issue. Many of these issues concerned connections between Defendant's clients' various pieces of hardware.

74. *Project Engineer/Technician.* Yassa's duties as a Project Engineer/Technician mirrored those of all Project Engineers/Technicians.

75.     As a Project Engineer/Technician, Yassa's duties centered around assisting Defendant's clients with on-boarding, updating, upgrading, and servicing their software and hardware.

76.     Yassa and other Project Engineers/Technicians would travel to Defendant's clients' locations to install and upgrade new equipment and software.  This was done for both new and existing clients.

77.     For new clients, Yassa and other Project Engineers/Technicians were required to uninstall existing hardware and software and install Defendant's hardware and/or software in its place.

78.     Yassa and other Project Engineers/Technicians would then be required to ensure that the launch of the new software and hardware was successful.

79.     Yassa and other Project Engineers/Technicians would ensure that the end-users were able to successfully log on to and use the new software and/or hardware.  This was accomplished through general training of the client's personnel, as well as direct in-person and remote technical assistance.

80.     Yassa and other Project Engineers/Technicians would continue to assist Defendant's customers with any technical problems that arose after the initial onboarding, upgrade, and/or update.  This was primarily done via remote access.

81.     Yassa and other Project Engineers/Technicians were also required to respond to inquiries from Defendant's customers and management in regard to project status.

82.     *Technical Project Lead*.  Yassa's duties as a Technical Project Lead mirrored those of all other Technical Project Leads.

83.     Yassa's and other Technical Project Leads' duties included those of Project Engineers/Technicians.  The only difference between the two (2) positions was the amount of experience or length of service with the company.

84.     Yassa's and other Technical Project Leads would develop "Best Practice Checklists" (hereinafter, "Checklists") for the benefit of Project Engineers/Technicians.

85.     These Checklists were nothing more than a simple "How-to" guide for the less experienced Project Engineers/Technicians.

86.     In creating these Checklists, Yassa and other Technical Project Leads drew only on their experience, and were given no advanced training or education in how to perform the duties they were to describe or in how to create the Checklists.

87.     The process for creating these Checklists consisted solely of performing the desired task and documenting the steps taken to accomplish that task.

88.     These Checklists were not policies or procedures put in place or enforced by Defendant.  There were no repercussions for failing to follow these Checklists.  These were merely to be used as a guide and support for less experienced Project Engineers/Technicians.

89.     In addition to creating the Checklists, Yassa and other Technical Project Leads would answer technical questions and assist Project Engineers/Technicians with their assigned tasks when they ran into problems they could not solve due to their limited experience and/or training.

90.     Yassa and other Technical Project Leads would assist high-profile end-users[6] to log on and use Defendant's software and/or hardware.

---

[6] Whereas Project Engineers/Technicians were to assist with any issues that arose and answer any questions from any of Defendant's clients' staff, Plaintiffs and other Technical Project Leads were assigned to resolve any issues and answer any questions that came from Defendant's clients'

91.     *Project Department Manager.*  Yassa's duties as a Project Department Manager mirrored those of all other Project Department Managers.

92.     Yassa's and other Project Department Managers' duties related primarily to the day-to-day operation of Defendant's Project Department.

93.     Yassa and other Project Department Managers would receive projects from Defendant and would assign various members of the Project Department to that project.

94.     Yassa and other Project Department Managers would establish deadlines and determine resource allocation.

95.     Yassa and other Project Department Managers would evaluate the performance of members of the Project Department.

96.     Yassa and other Project Department Managers would assist Project Engineers/Technicians, Technical Project Leads, and other members of the Project Department with any technical questions and/or issues.

97.     Yassa and other Project Department Managers would calculate and deliver the expected Return on Investment to Defendant's management once the costs and other financial considerations had been determined.  Yassa and other Project Department Managers would also provide Defendant's clients with project cost reports once the costs had been finalized.

98.     Yassa and other Project Department Managers did not hire or fire any members of the Project Department.

99.     Yassa and other Project Department Managers' role was primarily that of a resource for the members of the Project Department and a technical point of contact for Defendant's clients.

---

management and/or executive personnel.  The "lead" designation was recognition of the experience and tenure of Plaintiffs and other Technical Project Leads.

100.    While performing his daily tasks, Plaintiffs and other similarly situated employees did not require any specialized training or advanced knowledge.

101.    Plaintiffs and others similarly situated did not perform any analysis.

102.    Plaintiffs and others did not interpret any information.

103.    Plaintiffs and others similarly situated did not write any administrative or analytical reports.

104.    Plaintiffs and other similarly situated employees did not write, modify, or create any code for any software.

105.    Plaintiffs and other similarly situated employees did not analyze any systems.

106.    Plaintiffs and other similarly situated employees did not design or develop any computer programs or prototypes.

107.    Plaintiffs and other similarly situated employees did not test, create, design, or modify computer programs related to machine operating systems.

108.    Regardless of their title, Plaintiffs were also required to be on-call.  Plaintiffs were put on a three (3) to six (6) week rotation with other Engineers/Technicians.  Every three (3) to six (6) weeks, Plaintiffs and others similarly situated would be on-call for an entire calendar week.

109.    While on call, Plaintiffs were required to respond to any service call that came in between the hours of 6:00 a.m. and 8:00 a.m., as well as 5:00 p.m. to 12:00 a.m., Monday through Friday.  On Saturday and Sunday their on-call hours were from 6:00 a.m. to 12:00 a.m.

110.    When on call, Plaintiffs were severely restricted in what they could do.

111.    Plaintiffs were unable to consume alcohol while on call.  They had to be prepared to address any client problems that arose.  Plaintiffs often had to travel during on-call periods.

112.     Plaintiffs were also required to respond immediately to the question or issue raised. Plaintiffs were expected to be logged on to a computer with a secure internet connection and assisting the client within fifteen (15) minutes of taking the call.  If the issue required Plaintiffs to travel, they were expected to leave immediately from wherever they were.

113.     Plaintiffs were required to remain in an area that was both private and had a reliable and secure internet connection.

114.     Plaintiffs recall receiving an average of seven (7) calls per day each weekday that they were on call.  Plaintiffs can recall receiving as many as fifty (50) to sixty (60) calls per day on the weekends when they were on call.

115.     Plaintiffs and other similarly situated employees were also required to travel to Defendant's clients' locations.  The primary purpose of these visits was to onboard new clients. During these visits, Plaintiffs and other similarly situated employees would review the scope of work to be completed.  They would also determine what equipment could be kept during the transition and what equipment would need to be upgraded.

116.     Many of these locations were out of state.  It was required that Plaintiffs travel to any location where Defendant's service was being established.

117.     Plaintiffs and other Technicians/Engineers satisfied the requirements of their job and adequately performed their duties to benefit Defendant, as well as Defendant's clients.

118.     Plaintiffs and other Engineers/Technicians performed their duties fully to the extent required by Defendant.

## *Compensation*

119.    Plaintiffs were all paid on a salary basis by Defendant throughout their employment, until September 2015.[7]  Plaintiffs received the same bi-monthly payments regardless of the number of hours they worked each week.  Plaintiffs' salaries were based on the positions they held and they changed each time Plaintiffs were given a new title with Defendant.

120.    *Plaintiff Yassa.* From approximately March 2007 to October 2013, Yassa was employed as a Systems Engineer/Technician.  During this time, Yassa was paid bi-monthly payments reflecting an annual salary of approximately sixty thousand dollars ($60,000.00).

121.    From approximately November 2013 to August 2015, Yassa was employed as a Project Engineer/Technician.  For that position, his bi-monthly payments reflected an annual salary of approximately sixty-four thousand dollars ($64,000.00).

122.    From approximately September 2015 to April 2016, Yassa was employed as a Technical Project Lead.  For that position, his bi-monthly payments reflected an annual salary of approximately seventy thousand dollars ($70,000.00).

123.    From approximately April 2016 to September 15 2016, Yassa was employed as a Project Department Manager.  For that position, his bi-monthly payments reflected an annual salary of approximately eighty-three thousand dollars ($83,000.00).

124.    *Plaintiff Arnicar*.  From approximately August 2011 to June 2016 Arnicar was employed as a Systems Engineer/Technician.  For that position, Arnicar received bi-monthly payments that reflected an annual salary that ranged from approximately fifty thousand dollars

---

[7] Bates and Blazejak were reclassified to hourly employees sometime between September of 2015 and February of 2016.  From then on they began to receive overtime payments of "time-and-a-half" their regular hourly rates.  Consequently, any mention to Blake and/or Blazejak refers to the period prior to their reclassification.

($50,000.00) when Arnicar was hired, to approximately seventy-two thousand dollars ($72,000.00) at the time Arnicar quit.

125. *Plaintiff Bates.* From approximately January 2012 to August 2012, Bates was employed as a Desktop Support Engineer/Technician. Bates received bi-monthly payments reflecting an annual salary of forty thousand dollars ($40,000.00).

126. From approximately August 2012 to April 2014, Bates was employed as a Proactive Administrator. For that position, his bi-monthly payments reflected an annual salary of approximately forty-two thousand dollars ($42,000.00).

127. From approximately April 2014 until the end of Bates' employment in February 2016, Bates was employed as a Network Specialist. For that position, his bi-monthly payments reflected an annual salary that ranged from approximately forty-eight thousand dollars ($48,000.00) to fifty-one thousand dollars ($51,000.00).

128. *Plaintiff Blazejak.* From approximately August of 2013 to July of 2014, Blazejak was employed as a Desktop Support Engineer/Technician I. His bi-monthly payments reflected an annual salary of approximately forty thousand dollars ($40,000.00).

129. From approximately July of 2014 to March 2015, Blazejak was employed as a Desktop Support Engineer/Technician II. For that position, his bi-monthly payments reflected an annual salary of forty-three thousand dollars ($43,000.00).

130. From approximately March of 2015 to July 22, 2016, Balzejak was employed as a Proactive Administrator. For that position, his bi-monthly payments from March 2015 to March 2016 reflected an annual salary of forty-five thousand dollars ($45,00.000).

131. *Plaintiff Dausch.* From approximately January 2011 to December 2014, Dausch was employed as a Proactive Administrator. For that position, until January 2014, Plaintiff was

paid bi-monthly payments reflecting an annual salary of approximately fifty-one thousand dollars ($51,000.00). From approximately January 2014 to December 2014, Dausch received bi-monthly payments reflecting an annual salary of approximately fifty-eight thousand dollars ($58,000.00).

132.    *Plaintiff Webster.* Webster was hired in March 2010 as a Desktop Support Engineer/Technician. For that position Webster received bi-monthly payments reflecting an annual salary of approximately forty-five thousand dollars ($45,000.00). Webster quit in August 2015. At various times throughout his employment, Webster received raises from Defendant. These raises were, at times, associated with a change in position. At the time he quit, Webster held the title of Network Specialist and received bi-monthly payments reflecting an annual salary of approximately eighty-one thousand dollars ($81,000.00).

### *Schedule and Hours Worked*

133.    Upon being hired, Defendant informed Plaintiffs that their assigned schedule was 8:00 a.m. to 5:00 p.m. Monday through Friday.[8] This was to include a one (1) hour break for lunch.[9]

134.    Plaintiffs were required to attend daily meetings that began no later than 7:55 a.m. Tardiness was unacceptable and was a source of disciplinary proceedings. Consequently, Plaintiffs would regularly arrive by 7:45 a.m. or earlier.

135.    Plaintiffs would also arrive at work before 8:00 a.m. in order to begin their assignments before Defendant's clients began to call and before the daily meeting. Plaintiffs

---

[8] For much of his employment, including the majority of the time period relevant to this Complaint, Plaintiff Arnicar was scheduled to arrive by 6:30 a.m. to open Defendant's office. Arnicar was scheduled to leave at 3:30 p.m. during that time.

[9] For the first few months of his employment, Yassa recalls having worked this forty (40) hour schedule. This ended shortly thereafter.

typically reported to work before 7:45 a.m. While on call, Plaintiffs would routinely begin working at 6:00 a.m. from home, prior to leaving for the office.

136. In order to finish all of their assignments, Plaintiffs would often leave well after 5:00 p.m. In fact, leaving after 9:00 p.m. became routine. Plaintiffs would also continue working from home after hours. Working from home until midnight was a regular occurrence.

137. Plaintiffs Bates and Blazejak, as well as other Desktop Support Engineers/Technicians, would regularly participate in "ticket-closing parties." These "parties" would occur after standard business hours. The premise was that Plaintiffs and other Desktop Support Engineers/Technicians would work through as many tickets as possible in an attempt to clear the queues. These "parties" became increasingly common as Defendant's business grew. These "parties" would last several hours, often resulting in Plaintiffs and other Desktop Support Engineers/Technicians leaving work well past the time their shift was scheduled to end.

138. Plaintiffs were also required to continue responding to inquiries, from clients and Defendant's management, regardless of the time of the inquiry. These inquiries were often made well after the Plaintiffs left the office.

139. Plaintiff Yassa was also often on call. He was regularly required to be on call in the morning and evening on weekdays and during all weekend hours. While on call, Plaintiff's activities were extremely limited. He had to ensure that he was always able to respond to a clients' needs or problems.

140.    Plaintiffs all had to be on call during their employment.  The only differences between their collective on-call experiences were the frequency of being on call[10] and any modifications to their respective schedules that occurred as a result of being on call.[11]

141.    Plaintiffs' excessive hours resulted primarily from understaffing.  Defendant failed to hire sufficient additional staff to manage its growing client-base.  Instead, Defendant continued to assign additional projects and tasks to Plaintiffs and other similarly situated employees.

142.    Defendant's business grew substantially during Plaintiffs' tenures.  As Defendant's business grew, the number of projects that were assigned to Plaintiffs and other similarly situated employees also grew.

*Overtime*

143.    During the course of their employment, Plaintiffs regularly worked far in excess of forty (40) hours per week.  Plaintiffs and other similarly situated employees regularly worked between sixty (60) and eighty-five (85) hours on a weekly basis.

144.    Due to understaffing,[12] Plaintiffs and other similarly situated employees were regularly assigned to more projects and/or tickets than they could possibly complete during regular

---

[10] For example, during the relevant period to this Complaint, Plaintiff Webster was on call every three (3) weeks.  Plaintiff Yassa, on the other hand, was on call every four (4) to six (6) weeks.  Plaintiff Arnicar was on call every month to month and a half.

[11] Plaintiff Webster would be given Thursday off on weeks where he was on call.  This was to account for the additional hours worked on Saturday and Sunday, however the mere shift of eight (8) hours of work did not account for the hours Plaintiff was on call throughout the weeks and weekends where he was on-call.

[12] At the beginning of his employment, Plaintiff Yassa can recall that there were six (6) members of the "Project Department" where he was assigned, (three [3] Project Engineers/Technicians and three [3] Project Managers).  During that time, the project department completed approximately fifteen (15) to twenty (20) projects annually.  Towards the end of his employment.  Yassa can recall that there were nine (9) members of the project department (four [4] Project Engineers/Technicians, four [4] Project Managers, and one [1] Project Assistant Manager).  During this time, the project department would handle approximately one hundred (100) to one hundred and ten (110) projects annually.

working hours. Their workload prevented the completion of their assignments within a forty-hour (40) week. However, Defendant made clear that completing all of their assigned tasks was mandatory. As a result, Plaintiffs and other similarly situated employees would begin working well before their scheduled shifts and would also regularly remain at work well past their scheduled departure times.

145. Even when he was not on call, Yassa and other similarly situated employees regularly began working as early as 6:00 a.m. in order to get a start on their assigned tasks before Defendant's clients began to call at around 8:00 a.m. This contributed substantially to the total overtime hours worked by Yassa and other similarly situated employees.

146. Plaintiffs Bates and Blazejak, as well as other similarly situated employees, were required to be present for a meeting that began no later than 7:55 a.m. on a daily basis. In order to ensure timely arrival and presence for the meeting, Plaintiffs and other similarly situated employees were expected to arrive by 7:45 a.m. each day.

147. At 8:00 a.m., the time when Plaintiffs and other similarly situated employees were scheduled to begin their shift, technical support as well as project-related calls (hereinafter collectively, "client calls") would begin to pour in. Any time Plaintiffs' phones rang, they were required to drop whatever they were doing and assist Defendant's clients with their questions or issues. Defendant made clear that client calls took precedence over any other task. This had the practical effect of constantly interrupting the workday of Plaintiffs and other similarly situated employees and preventing them from effectively working on their other assignments.

148. Plaintiffs and other similarly situated employees would also routinely work well into the evening due to the fact that a lot of the work related to new projects had to be completed

outside of regular business hours.  This also greatly increased the amount of overtime hours worked by Plaintiffs and others similarly situated.

149.    Plaintiffs Bates and Blazejak would also routinely stay well after their shifts had ended in order to clear their queues.  Defendant made clear that finishing all of their assigned tickets on a daily basis was a requirement, and consistent failure to do so would result in disciplinary actions.

150.    Plaintiffs Bates and Blazejak, as well as other similarly situated employees, would regularly be required to remain at work after their scheduled shift had ended for "ticket-closing parties."  These "parties" could last several hours, with Plaintiffs and other similarly situated employees remaining at work until after 8:00 p.m.

151.    When on call, Plaintiffs and other Technicians regularly worked from 6:00 a.m. until 12:00 a.m.  This persisted through the entire seven (7) days Plaintiffs and others similarly situated were on call.  This also greatly increased the total overtime Plaintiffs and others similarly situated worked.

152.    Despite working well over forty (40) hours per workweek, Plaintiffs and other similarly situated employees were only paid their regular salary.

153.    Consequently, Plaintiffs and others similarly situated were not compensated at a rate of "time-and-a-half" for all overtime hours worked.  This occurred for the duration of their employment.

154.    There is no bona fide dispute that Plaintiffs and other similarly situated employees are owed overtime wages for all hours worked over forty (40) in a workweek.

155.    At no time did Plaintiffs or other similarly situated employees qualify for any exemption to the FLSA, MWHL, or the MWPCL.

156.    Plaintiffs' and other similarly situated employees' duties did not fall under any exemption.   Therefore, Plaintiffs and other similarly situated employees are non-exempt employees entitled to overtime payments for all hours worked over forty (40) per workweek.

157.    Defendant was well aware of the excessive hours that Plaintiffs and other Technicians consistently worked.  Defendant and its agents were regularly in Plaintiffs' and other similarly situated employees' work space.

158.    Defendant also distributed the assignments to Plaintiffs and other similarly situated employees that required them to leave the office.  Defendant's managers also routinely contacted Plaintiffs and other similarly situated employees well after their shift had ended.   Therefore, Defendant was well aware of the work Plaintiffs and other Technicians performed from home and/or other remote locations.

159.    Defendant knew that Plaintiffs and other similarly situated employees customarily worked well over forty (40) hours per week.

160.    Defendant suffered, permitted, and/or required Plaintiffs and other similarly situated employees to work these overtime hours.

161.    Defendant, acting without good faith, withheld these overtime wages, even after Plaintiffs and others similarly situated inquired about the wages missing from their pay-checks.

162.    Throughout their employment, Plaintiffs made consistent complaints with regard to Defendant's failure to pay overtime wages.  Plaintiffs can recall one instance where the President of the company held a "public forum" where employees could voice their concerns and be heard. Plaintiffs and several other employees brought up the issue of overtime pay.  They were silenced in return.  Despite their numerous complaints, no action was taken to change the manner in which Plaintiffs and other similarly situated employees were paid.

163.    Consequently, on behalf of themselves and all those similarly situated, Plaintiffs seeks the wages to which they are entitled and other available relief through this Complaint.

## FLSA COLLECTIVE ACTION ALLEGATIONS

164.    Plaintiffs and other similarly situated employees work or worked as Desktop Support Engineers/Technicians, Proactive Administrators, Network Specialists, Systems Engineers/Technicians, Project Engineers/Technicians, and Technical Project Leads (hereinafter collectively, "Engineers/Technicians") for Defendant.   They were all employed to assist Defendant's clients with various IT needs.

165.    The FLSA requires employers to compensate non-exempt employees, such as Plaintiffs and others similarly situated, with overtime wages for all hours worked over forty (40) within a workweek.

166.    Defendant knew that Plaintiffs and other similarly situated employees did not qualify for any exemption to the FLSA's overtime provision.

167.    Defendant knew that Plaintiffs and similarly situated employees typically worked over forty (40) hours per week.

168.    Defendant, suffered, permitted, and/or required Plaintiffs and other similarly situated employees to work more than forty (40) hours per week.

169.    Defendant knew or should have known that Plaintiffs and other similarly situated employees were entitled to overtime pay for all hours worked over forty (40) in a workweek.

170.   Regardless of the number of hours Plaintiffs and other similarly situated employees worked per week, Defendant did not pay them any additional pay for the hours worked over forty (40).[13]

171.   Pursuant to the FLSA, Plaintiffs commence this collective action against Defendant on behalf of himself and those similarly situated.

172.   Plaintiffs demand damages reflecting an overtime rate of not less than one and a half (1.5) times their regular rates of pay for all hours worked over forty (40) in any workweek within the applicable statute of limitations.  Plaintiffs make these same demands on behalf of all members of the putative Collective class.

173.   Plaintiffs consent to be party Plaintiffs in this matter.  Plaintiffs' consent forms are attached to this Complaint as Exhibits A-F.

174.   It is likely that other individuals will join Plaintiffs during the litigation of this matter and file written consents to "opt in" to this collective action.

175.   There are numerous similarly situated current and former employees of Defendant that have been harmed by Defendant's common scheme to underpay its employees and violate the FLSA and are thereby fit for membership in the Collective class of similarly situated employees.

176.   These similarly situated persons are known to Defendant and are readily identifiable through Defendant's records.

---

[13] Between September 2015 and February 2016 Defendant began reclassifying certain employees to hourly.  The determination of which employees were to be reclassified depended solely on their salary level.  All of Defendant's employees with an annual salary below fifty thousand dollars ($50,000.00) were reclassified as hourly employees and began to receive overtime premiums. Therefore, the Collective class covers (1) all similarly situated employees to Plaintiffs for the period prior to the reclassification and (2) all similarly situated employees who were not reclassified during the period following the reclassification.

177.     Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit as members of the Collective class.

178.     Upon information and belief, other similarly situated employees will choose to join Plaintiffs in this action against Defendant and opt in to this lawsuit to recover unpaid wages and other available relief.

## CLASS ACTION ALLEGATIONS UNDER MARYLAND WAGE LAWS

179.     Plaintiffs bring this action Pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and other current and former employees that served as Technicians for Defendant and were subject to the following practices and policies:

180.     Denial of overtime wages under MWHL for hours worked over forty (40) in a single workweek; and

181.     Denial of all wages owed to Plaintiffs and other similarly situated Technicians at the termination of their employment in violation of the MWPCL.

182.     The classes Plaintiffs seek to represent are defined as:

*MWHL Class*

> All individuals who are or were employed by Defendant as Desktop Support Engineers/Technicians, Proactive Administrators, Network Specialists, Systems Engineers/Technicians, Project Engineers/Technicians, and/or Technical Project Leads for any period ranging from March 1, 2014 to the present, who were paid on a salary basis, and who were not paid an overtime rate of time-and-a-half their regular rate for all hours worked over forty (40) in a workweek in violation of MWHL.

*MWPCL Class*

> All individuals who were, but are no longer, employed by Defendant as Desktop Support Engineers/Technicians, Proactive Administrators, Network Specialists, Systems

Engineers/Technicians, Project Engineers/Technicians, and/or Technical Project Leads for any period ranging from March 1, 2014 to the present, who were paid on a salary basis and who were not paid an overtime rate of time-and-a-half their regular rate for all hours worked over forty (40) in a workweek in violation of MWHL and thus did not receive all wages owed to them before the termination of their employment with Defendant in violation of the MWPCL.

183. *Numerosity:* The individuals in the class are sufficiently numerous that joinder of all members is impracticable. Although the precise number of such individuals is currently unknown, on information and belief, the class includes dozens of employees who are readily identifiable through Defendant's pay records. Defendant employed dozens of Engineers/Technicians across the state of Maryland. Defendant services hundreds of customers throughout Maryland and across the United States through its Engineers/Technicians. Consequently, numerosity exists.

184. *Commonality:* There are questions of law and fact common to the classes. Among the common questions of law and fact applicable to Plaintiffs and the classes are:

    i. Whether the MWHL Class is similarly situated because they all performed the same basic duties and were subject to Defendant's common policy and practice of not paying them overtime;

    ii. Whether Defendant employed the MWHL Class within the meaning of MWHL;

    iii. Whether Defendant violated MWHL by failing to pay Plaintiffs and the MWHL Class overtime compensation for hours worked in excess of forty (40) hours per workweek;

    iv. Whether Defendant's violations of MWHL were willful;

    v. Whether Defendant employed the MWPCL Class within the meaning of the MWPCL;

vi.   Whether Defendant failed to provide Plaintiffs and other members of the MWPCL Class with all wages due at the time their employment ended in violation of the MWPCL;

vii.   Whether Defendant's violations of MWPCL were willful; and

viii.   Whether Defendant is liable for damages claimed herein, including but not limited to, compensatory, liquidated or treble, statutory, interest, costs and attorneys' fees.

185.   *Typicality:* Plaintiffs' claims are typical of those of the classes. Specifically, each and every class member of both the MWHL Class and the MWPCL Class worked as a Desktop Support Engineers/Technicians, Proactive Administrators, Network Specialists, Systems Engineers/Technicians, Project Engineers/Technicians, and/or Technical Project Leads for Defendant. Each and every MWHL Class member was required to work well over forty (40) hours per workweek to keep up with Defendant's imposed schedule and regular understaffing. Each class member for both classes was paid a salary that remained unchanged, regardless of whether the class member worked over forty (40) hours per week. Every member of the MWPCL Class failed to receive all wages owed to them at the end of their employment. As a result, each and every class member suffered the same harm. This was due to Defendant's failure to pay a proper overtime premium for all hours worked in excess of forty (40) hours per workweek and the subsequent failure to pay to Plaintiffs and other members of the MWPCL Class all wages owed to them at the conclusion of their employment. This constitutes a direct violation of MWHL, as well as a subsequent violation of the MWPCL.

186.   *Adequacy:* Plaintiffs will fully and adequately protect the interests of the classes. They seek the same recovery as the classes, predicated upon the same violations of the law and the same damage theory. Plaintiffs have also retained counsel who are qualified and experienced in the

prosecution of statewide wage and hour class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the classes.

187. *Predominance:* The common issues of law and fact predominate over any individual issues. Each class member's claim is controlled by Maryland's wage and hour statutory scheme and one set of facts. This is based on Defendant's failure to pay overtime as required by MWHL and its subsequent failure to pay all wages due at the end of an individual's employment as required by the MWPCL. Similarly, the damages are eminently certifiable in that Defendant's records will provide the amount and frequency each class member was paid as well as the amount of time each class member worked.

188. This action is maintainable as a class action. The prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications with respect to individual members of the classes. This would establish incompatible standards of conduct for Defendant. If they were to pursue their claims separately, the numerous adjudications that would be required to protect the individual interests of the class members would constitute a considerable drain and burden on judicial resources.

189. Accordingly, the Court should certify the proposed classes.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

### *Against Defendant EM Consulting Group, Inc. t/a Helion Automotive Technologies*

**Count I. *Violation of the FLSA: Failure to Pay Overtime Wages to Plaintiffs and all Members of the Collective Class Who, During The Course of This Matter, Opt-In to the Suit by Submitting their Consent Forms to Become Party Plaintiffs.***

190. Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

191.     Plaintiffs are entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

192.     As described above, Plaintiffs have not received from Defendant compensation reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

193.     Defendant willfully and intentionally failed to compensate Plaintiffs properly for the overtime wages they are owed.

194.     There is no bona fide dispute that Plaintiffs are owed overtime wages for work performed for Defendant.

195.     All members of the putative Collective are similarly situated to Plaintiffs, and have suffered the same and/or similar harm resulting from the same policies and practices complained of in this Complaint.

196.     Under the FLSA, Plaintiffs and all members of the Collective are entitled to additional wages from Defendant to compensate them for hours worked in a workweek in excess of forty (40) at a rate of one and one-half (1.5) times Plaintiffs' and each member of the Collective's regular hourly wage rate.

**Count II.** ***Violation of MWHL:  Failure to Pay Overtime Wages to Plaintiffs and All Members of the MWHL Class, to be Certified by Motion During the Course of This Matter.***

197.     Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

198.     Pursuant to Maryland Labor and Employment Code Ann. § 3-415, each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate; furthermore, pursuant to Maryland Labor and Employment Code Ann. § 3-420(a), an employer

36

shall compute the wage for overtime under § 3-415 on the basis of each hour over forty (40) that an employee works during one (1) workweek.

199.    Plaintiffs have not received proper compensation from Defendant reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

200.    Defendant willfully and intentionally did not compensate Plaintiffs for the overtime wages they are owed.  There is no bona fide dispute that Plaintiffs are owed overtime wages for work performed for Defendant.

201.    All members of the MWHL Class are similarly situated to Plaintiffs, and have suffered the same harm resulting from the same policies and practices complained of in this Complaint.

202.    Under MWHL, Plaintiffs and members of the MWHL Class are entitled to additional wages from Defendant for all overtime hours worked at a rate of one and one-half (1.5) times Plaintiffs' and each MWHL Class member's regular hourly wage rate.

**Count III. *Violation of the MWPCL: Failure to Pay Wages Owed at the Termination of Their Employment to Plaintiffs and to All Members of the MWPCL Class, to be Certified by Motion During the Course of This Matter.***

203.    Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

204.    Plaintiffs are entitled to wages under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§3-501 *et seq.*, which provides that each employer shall pay an employee all wages due for work that the employee performed before the end of employment, on or before the day on which the employee would have otherwise been paid the wages.

205.    In accordance with §3-505(a), Plaintiffs have not received compensation from Defendant for all wages owed for work performed before the termination of his employment.  This

is specific to Defendant's failure to pay Plaintiffs the overtime wages that they are entitled to. Similarly, Defendant failed to pay the members of the MWPCL Class correctly in the same manner.

206. Defendant willfully and intentionally did not compensate Plaintiffs or the members of the MWPCL Class for the wages owed to them and continued to violate the MWPCL, even after Plaintiffs informed Defendant of the violation.

207. All members of the MWPCL Class are similarly situated to Plaintiffs, and have suffered the same harm resulting from the same policies and practices complained of in this Complaint.

208. Under the MWPCL, there is no bona fide dispute that Plaintiffs and the MWPCL Class are owed wages for work performed while employed by Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and others similarly situated, pray for the following relief:

a) In accordance with 29 U.S.C. § 216(b), designation of this action as a collective action on behalf of Plaintiffs and those similarly situated;

b) In accordance with Rule 23 of the Federal Rules of Civil Procedure, designation of this action as a Maryland state law class action on behalf of Plaintiffs and all members of the proposed classes;

c) Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names, addresses, and emails of all those individuals who are similarly situated and permitting Plaintiffs to send notice of this action to all those similarly situated individuals;

d) Designating the named Plaintiffs to act as class representatives on behalf of all similarly situated employees for both the FLSA Collective class and the Maryland state law classes;

e) Judgment against Defendant for its failure to pay Plaintiffs, those similarly situated, and all those appropriately joined to this matter in accordance with the standards set forth by the FLSA;

f) Judgment against Defendant for its failure to pay Plaintiffs, the members of the MWHL Class, and all those appropriately joined to this matter in accordance with the standards set forth by MWHL;

g) Judgment against Defendant for its failure to pay Plaintiffs, the members of the MWPCL Class, and all those appropriately joined to this matter in accordance with the standards set forth by the MWPCL;

h) Judgment against Defendant and classifying its conduct as willful and not in good faith;

i) Judgment against Defendant and classifying Plaintiffs, the Collective and the Classes as non-exempt employees entitled to protection under the FLSA, MWHL and the MWPCL;

j) An award against Defendant for the amount of unpaid overtime wages owed to Plaintiffs, members of the Collective, members of the MWHL Class, and all those appropriately joined to this matter calculated at a rate that is not less than one and a half (1.5) times Plaintiffs' and others' respective regular hourly rate for all overtime hours worked;

k) An award of liquidated or trebled damages equal to, or double, the total amounts of unpaid wages owed to Plaintiffs, members of the Collective, members of the classes, and all those appropriately joined to this matter, whichever is deemed just and equitable by this Honorable Court;

l) An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendant;

m) Leave to add additional Plaintiffs to all Counts alleged herein by motion, through the filing of written consent forms, or any other method approved by this Honorable Court; and

n) All further relief deemed just and equitable by this Honorable Court.

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request that a jury of their peers hear and decide all possible claims brought on behalf of Plaintiffs and those similarly situated.

Respectfully submitted,

*/s/ George E. Swegman*
George E. Swegman, Esq. (19444)
gswegman@nicholllaw.com
Benjamin L. Davis, III, Esq. (29774)
bdavis@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
Fax No.:    (410) 244-8454

*Attorneys for Plaintiffs*